**Opinion issued September 21, 2021**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-21-00163-CV

—————————————

## IN THE INTEREST OF O.J.P., A CHILD

———————————————————————

**On Appeal from the 246th District Court
Harris County, Texas
Trial Court Case No. 2016-25857**

———————————————————————

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's

order, entered after a bench trial, terminating her parental rights to her minor child,

O.J.P.[2] In two issues, mother contends that the evidence is factually insufficient to

---

1  *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

2  The trial court also terminated the parental rights of O.J.P.'s father ("father"). He
  is not a party to this appeal.

support the trial court's finding that termination of her parental rights was in the best interest of O.J.P.[3] and the trial court erred in appointing the Department of Family and Protective Services ("DFPS") as O.J.P.'s sole managing conservator.

We affirm.

## Background

On July 26, 2019, the DFPS filed a petition seeking termination of mother's parental rights to O.J.P. and managing conservatorship of O.J.P.[4]

### *Father*

Father testified that prior to the current case, DFPS had removed O.J.P. from the care of mother and father in the past because of "domestic issues." O.J.P. was first removed from their care in 2015, and he was removed from their care a second time in 2017.[5] In 2017, mother and father were having "[d]omestic issues" and law enforcement officers "show[ed] up" and contacted DFPS. The "[d]omestic issues," in part, were about "the way [they] were living" and "stress and resentment towards each other." Mother and father got into physical fights, and they both hit each other

---

[3]   *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

[4]   O.J.P. was born in June 2014. He was about six-and-a-half years old at the time of trial.

[5]   Father noted that DFPS initially became involved with mother and father when O.J.P. was born. O.J.P. was not removed from the care of mother and father at that time, but father and mother participated in a Family Services Plan ("FSP"), which they completed. O.J.P. was removed from their care for the first time about a year later in 2015.

2

on multiple occasions. At times, O.J.P. was present for the fights. Mother and father sustained minor bruising from their fights. Father agreed that he had "a history of domestic violence with" mother. Father also stated that mother had been "violent" with him and had assaulted him in front of O.J.P.

In 2017, mother and father were also both using marijuana "[a] few times a week," and father believed that their marijuana use contributed to their physical fights and to O.J.P. being removed from their care. O.J.P. was returned to the care of mother and father about nine to twelve months after his removal in 2017, and after O.J.P. was returned to their care, mother and father started using marijuana again "[a] few times a week."

In 2019, mother and father started using methamphetamine. Father admitted to using narcotics with mother while O.J.P. was in another room, and he stated that it happened "often." Father did not think it was in O.J.P.'s best interest for him and mother to use narcotics while O.J.P. was present.

Father could not recall how often mother used methamphetamine while O.J.P. was in her and father's care during the first few months of 2019. When mother used methamphetamine, her "entire demeanor w[as] different." She would tell father "that she would hear . . . the neighbors through the walls talking about her," and she did not act "normal." Mother's abnormal behavior occurred "[a]bout every other day or so" beginning in February 2019. Father believed that mother's

3

methamphetamine use caused O.J.P. "to be abused or neglected" because mother would not get "Medicaid" coverage for O.J.P. "because she was afraid that she would get noticed by [law enforcement]" and "she had warrants." So, mother would "neglect . . . provid[ing] [O.J.P. with] stuff, like insurance and dental [work]" even though she was O.J.P.'s custodial parent at the time. The last time that father saw mother using methamphetamine was in March 2019, on the day that O.J.P. was removed from the care of mother and father in the current case.

As to O.J.P.'s removal in March 2019, father explained that mother wanted father to drive her to a hospital to "get checked out" because she was feeling mentally unstable. Mother brought O.J.P. into the car with her and asked father to take O.J.P. to the child's maternal grandmother's home because mother did not want O.J.P. to stay with father while she was in the hospital. But father did not want to do that because mother had not contacted the maternal grandmother and she just wanted father "to show up [and] drop [O.J.P.] off." When "stuff . . . escalated" in the car on the way to the hospital, father called a DFPS caseworker to come and get O.J.P. Father stopped the car in a parking lot and waited for law enforcement officers and the DFPS caseworker to arrive. Father reported that he feared for O.J.P.'s safety. O.J.P. was removed from the care of mother and father at the time. Father told law enforcement officers that mother left O.J.P. in the living room unsupervised while she used narcotics in the bathroom.

As to O.J.P., father stated that O.J.P. called him either "[d]ad" or by his first name, and father noted that during the pendency of the case, he had visits with O.J.P. He last saw O.J.P. a few months before trial, and although the trial court never suspended his visits with O.J.P., father voluntarily stopped seeing the child because O.J.P. would act up in his current placement and at school after his visits with father.

Father conceded that O.J.P. "ha[d] some pretty serious dental issues" when he entered DFPS's care in 2019, and he required "significant dental care." Father stated that O.J.P. "did get dental work" while he was in the care of mother and father, but O.J.P. had never seen a primary care physician or a pediatrician while in the care of mother and father. Mother had allowed O.J.P.'s Medicaid coverage to "lapse." Father felt that O.J.P. deserved a stable home environment, educational services, and access to therapy and medical treatment. Father noted that, at the time of trial, O.J.P. was participating in therapy.

Father also testified that O.J.P. had autism and a speech delay. When O.J.P. was four-and-a-half-years old, O.J.P.'s speech was "babbly" and he could say "some key words, . . . like mom and dad and car," but "just a few . . . clear words." In 2018, mother and father "ha[d] doctors' appointments whe[re] [they] would get him evaluated for autism," and they "were getting information about programs that [they] could put him into to get speech therapy." The "red flag[s]" that father noticed at the time were O.J.P.'s speech delays and motor skill delays, which were the reasons

5

mother and father had O.J.P. "checked out" in 2018.  Father stated that O.J.P., while in the care of mother and father, received speech therapy for about two months in 2018.  The speech therapy seemed to be beneficial to O.J.P., but he did not receive any additional therapy that year and he did not receive any speech therapy at all while in the care of mother and father in 2019.  Father noted that, at the time, O.J.P.'s Medicaid coverage had lapsed and needed to be reinstated so that mother and father could take him to therapy sessions and to doctors' appointments.

According to father, when O.J.P. entered DFPS's care in 2019, his speech was "still babbly."  O.J.P. was able to "learn some words" from mother and father, but his "sentences [were] still . . . babbly."  They could only "make out what he[] [was] saying based on key words" and him pointing at things that he wanted.  Father believed that O.J.P.'s communication skills were "behind for his age."

Father also explained that while O.J.P. was in the care of mother and father, he had behavioral issues.  He would get frustrated because he had a difficult time communicating, and he would have temper tantrums.  Mother and father would try to calm O.J.P. down, and sometimes they would use candy to do so.  Father did not believe that he could care for O.J.P.'s medical and educational needs the way that

O.J.P. needed to be cared for. According to father, O.J.P. needed a routine to help with his autism, and mother and father never established a routine for O.J.P.[6]

Father noted that he had received a Family Service Plan ("FSP") and had completed the requirements of his FSP. Father had participated in random narcotics-use testing during the case, and he had tested negative for narcotics use. Ultimately though, he had signed an affidavit voluntarily relinquishing his parental rights to O.J.P. He requested that the trial court "accept [his] affidavit of relinquishment" because he believed that it was in the best interest of O.J.P. to be adopted by his foster family. Father also stated that he was relinquishing his parental rights to O.J.P. because of his history of narcotics use with mother and his unstable living environment.

As to O.J.P.'s foster family, father testified that O.J.P. had spent about "half his life" with the foster family. O.J.P.'s foster mother is one of mother's cousins. According to father, O.J.P. stayed with his foster family for about eight months when he was removed from the care of mother and father in 2015. When O.J.P. was removed from the care of mother and father in 2017, O.J.P. stayed with the foster family again for about a year. And O.J.P. was placed in his foster family's care in March 2019, when he was removed from the care of mother and father for a third

---

[6]     Father did note that when O.J.P. lived with him, O.J.P. slept, woke up and ate, and watched television. When O.J.P. was hungry, mother and father fed him. Those were things that happened daily.

7

time.[7] While O.J.P. had been in the care of his foster family, O.J.P. "ha[d] received everything that [mother and father had] wanted to give him in a much quicker time frame as far as his schooling, his medical [treatment], [and] his therapies." Father did not want O.J.P. to regress by being returned to the care of mother and father. Instead, he wanted O.J.P. to "continue going forward with everything . . . to better himself . . . for the future." According to father, the DFPS caseworker felt that O.J.P. was doing well in his current placement with his foster family, and father felt that O.J.P. was excelling in his placement with the foster family. Father believed that it was in O.J.P.'s best interest to stay with his foster family, and O.J.P. had thrived more with his foster family than he had in the care of mother and father. O.J.P.'s foster family had established a routine for him, and father believed that the stability was good for O.J.P.

Father also noted that O.J.P. had made a "huge improvement" in his speech while he had been in the care of his foster family. He was no longer "babbly." His speech was much clearer, and father could understand every word that O.J.P. said. Father attributed the improvement from the care that O.J.P. had been receiving from

---

[7] Father agreed that there was a time between March 2019 and the time of trial in November 2020 that O.J.P. "was not in the home" of his foster family. Father stated that the DFPS caseworker gave him the impression that the foster family had asked for O.J.P. to be removed from their home more than once. Father believed that being removed from the care of the foster family could have had an adverse effect on O.J.P.

his foster family. According to father, while O.J.P. had been in his foster family's care, he had received therapeutic services privately and through school. Father believed that O.J.P.'s foster family also had O.J.P. assessed for autism while he was in their care.

As to mother, father stated that he was no longer in a relationship with mother. He had spoken to mother once in the two months before trial, and mother was no longer attending a rehabilitation center. Mother told him that she was in Houston. Mother said that she was homeless, and she wanted father to help her. Father told mother that he was not "going to help her." Father did not believe that O.J.P. would be safe if he was returned to mother's care.

According to father, during their relationship, mother at one time worked at a certain restaurant and at another time, she worked at a Popeyes restaurant. When O.J.P. was removed from mother and father's care in 2019, mother was not employed. Nothing prevented mother from working.

Father also recalled an incident in 2018 involving mother. The League City Police Department ("LCPD") called father to come pick up O.J.P. from the LCPD station. About the incident, mother told father that she "got into an altercation with whoever she was living with and . . . the cops came and they arrested her." Mother also told father that she was intoxicated at the time and that was why law enforcement officers arrested her.

Finally, father noted that mother was required to participate in random narcotics-use testing during this case as part of her FSP, and father did not believe that mother had completed her FSP.

### *DFPS Caseworker Jones*

DFPS caseworker Ebonee Jones testified that, at the time of trial, O.J.P. was six-and-a-half years old and was placed with a foster family. DFPS wanted to establish permanency for O.J.P. O.J.P.'s foster mother was mother's cousin. O.J.P. had been in his current placement for most of the time since he was removed from the care of mother and father in 2019. O.J.P.'s foster family wanted to adopt him, but they did not plan to continue fostering O.J.P. if mother's or father's parental rights were not terminated.

Jones noted that during the pendency of this case, O.J.P. was removed from his foster family's home for a period of one week at the foster family's request. Jones stated that the foster family asked for O.J.P. to be removed because the foster family struggled with participating in the court-ordered visitation between O.J.P. and father, particularly because O.J.P. would have severe behavioral issues after his visits with father. Additionally, the foster family was concerned with the fact that mother and father were "in and out" of O.J.P.'s life, which factored into their unwillingness to participate in the visitations. During the week that O.J.P. was

removed from his foster family's home, O.J.P. struggled; he had tantrums and could not sleep. His foster family decided to have O.J.P. return to their home.[8]

According to Jones, O.J.P.'s foster family was meeting his physical and emotional needs. O.J.P. was "a happy kid." When O.J.P. entered DFPS's care, he required invasive medical procedures and dental treatment. O.J.P.'s foster family took him to his dental appointments. O.J.P.'s foster family reported that O.J.P. had tantrums, engaged in disruptive behavior, was unable to focus, and had trouble "being on task." And he had "bit[ten]" his teachers when he was upset. That particular behavior improved though during the COVID-19 pandemic when he began attending school virtually from home.[9]

---

[8] Jones noted that O.J.P.'s foster family had asked for the child to be removed from their care one other time during the pendency of this case, but they rescinded that request. Jones stated that the foster family did not want to "facilitate visits" with father and they were "a little frustrated" that the case had not yet been resolved. But Jones stated that the foster family did understand that "there[] [was] still a lot of legal stuff that ha[d] . . . to happen before they c[ould] . . . adopt" O.J.P.

[9] *See Kim v. Ramos*, No. 01-20-00861-CV, --- S.W.3d ---, 2021 WL 2692143, at *1 n.5, *6 & n.13 (Tex. App.—Houston [1st Dist.] July 1, 2021, no pet.) (explaining "COVID-19 is a disease caused by a novel coronavirus" and collecting cases discussing severity of COVID-19 and resulting global pandemic); *In re Landstar Ranger, Inc.*, No. 06-20-00047-CV, 2020 WL 5521136, at *4 (Tex. App.—Texarkana Sept. 15, 2020, orig. proceeding) (mem. op.) (noting "[a]s a result of the onset of the COVID-19 pandemic, on March 13, 2020, Texas Governor Greg Abbott issued a disaster proclamation certifying that COVID-19 posed an imminent threat of disaster for all counties in the state of Texas[, and] . . . Governor Abbott instituted health protocols, such as minimizing in-person contact, maintaining six feet between individuals, and suggesting that people wear masks when in the presence of other individuals"); *see also In re Reiss*, No. 05-20-00708-CV, 2020 WL 6073881, at *3 (Tex. App.—Dallas Oct. 15, 2020, orig. proceeding) (mem. op.)

11

Jones also stated that O.J.P. had been diagnosed with autism, an intellectual disability, and a speech impairment. And he received special services through his school, including speech therapy. He also received private occupational therapy and speech therapy that his foster family helped facilitate. O.J.P. had improved during the pendency of the case, and Jones believed his improvement was because of his foster family, who had "taken care of him and ensured that he ha[d] everything [that] he need[ed] in order to be successful with []his therap[ies]." O.J.P.'s foster family spent a lot of time engaging him in therapeutic activities outside of his normal therapy sessions. For instance, O.J.P's speech therapist gave his foster family different activities to do outside of the regular speech therapy sessions to help improve O.J.P.'s speech, and his foster family always completed those additional activities with O.J.P.

Jones also indicated that O.J.P. was going to be evaluated to receive Applied Behavioral Analysis ("ABA") therapy, and if he needed to receive ABA therapy, Jones believed that his foster family had the "temperament and the wherewithal to be able to work with [his] school and get the services in place." Whatever plan was put in place for O.J.P., his foster family would "follow the plan." His foster family had indicated that they enjoyed working with the personnel at O.J.P's school and

(noting "school-age children [are] learning at home virtually due to school closures" related to COVID-19 pandemic).

12

that O.J.P. liked his school. O.J.P.'s foster family supported O.J.P. receiving services that would help his educational process and his social skills. The foster family was willing to work with "other people," such as "Disability Rights Texas [and] local authority service coordinators[,] to help bring [any] services [that O.J.P. needed] into the home."

According to Jones, O.J.P. required stability, and it was in O.J.P.'s best interest to have a routine and familiarity. O.J.P. also required extensive care from his caregivers. To meet his educational needs, "a lot of time and effort on the part of" O.J.P.'s caregivers outside of school was required. Jones did not believe that mother was capable of meeting those needs. Because of O.J.P.'s age and physical and mental vulnerabilities, it was very important for O.J.P. to have a safe environment in which to live. Each of the three times that O.J.P. had been removed from mother and father's care, beginning in 2015, he had stayed with his same foster family.

As to mother, Jones testified that she had been given an FSP, and Jones had discussed the FSP with mother. As part of her FSP, mother was required to maintain employment and participate in parenting classes, a substance abuse evaluation, random narcotics-use testing, a psychosocial evaluation, and domestic violence classes. Mother did not complete the requirements of her FSP. Mother told Jones that she was homeless, and she never provided Jones with a leasing agreement.

13

Mother also did not participate in the random narcotics-use testing. Mother had four or five random narcotics-use tests scheduled, but she did not attend any of them. Although in August 2020—a few months before trial—mother told Jones that she was "working at a beauty supply" store, mother did not give Jones the address of the store or provide Jones with any pay stubs for that job or any job during the pendency of the case. Mother told Jones that she had attended parenting classes, but she did not provide a completion certificate. Mother participated in her substance abuse evaluation, but she did not participate in the substance abuse counseling that DFPS scheduled for mother. Mother did not participate in her psychosocial evaluation or domestic violence classes. There were months during the pendency of the case when DFPS could not locate mother, and Jones described mother's "presence in th[e] case" as "sporadic."

Jones also noted that as part of her FSP, mother was required to refrain from participating in any illegal or criminal activity during the pendency of the case. During Jones's testimony, the trial court admitted into evidence a copy of a criminal complaint and a copy of a judgment of conviction. The criminal complaint alleges that on or about September 30, 2019, during the pendency of this case, mother committed a criminal offense. Related to the September 2019 criminal offense, mother, during the pendency of this case, pleaded guilty to the state-jail felony

14

offense of theft,[10] and the trial court assessed her punishment at confinement for 100 days. O.J.P. was not in mother's care at the time she committed the criminal offense.

Jones further testified that during the pendency of the case, mother requested to attend the Santa Maria Hostel substance abuse rehabilitation center ("Santa Maria Hostel"), and DFPS helped mother obtain admission to the rehabilitation center. But mother did not complete her stay there. Mother was admitted to Santa Maria Hostel on August 6, 2020, and on August 19 or 20, 2020, mother sent Jones a text message stating that she wanted to go somewhere else and that she had left Santa Maria Hostel.

According to Jones, mother did not appear at all of the hearings during the pendency of the case and she had not visited O.J.P. since he entered DFPS's care in 2019. Mother never asked to have visits with O.J.P.,[11] but she had requested photographs of the child. Mother had also asked DFPS to do "welfare checks" on O.J.P. As to the "welfare checks," Jones explained that mother would send her "random text messages asking for welfare checks," stating that O.J.P. was "in danger" or that mother was "in danger." Mother stated that she "ha[d] been taken against her will," "the cartel [was] out to get her," and she "need[ed] witness protection." In response, Jones told mother "how [O.J.P. was] doing" and told her

---

[10]     *See* TEX. PENAL CODE ANN. § 31.03 ("Theft").

[11]     According to Jones, mother could have had bi-weekly visits with O.J.P.

15

to call for emergency assistance if she felt that she was in danger. Jones also provided mother with "resources for shelters in the area [where] she c[ould] go."

Jones further testified that O.J.P. knew mother by her first name and referred to her by her first name. Although Jones had told O.J.P. that mother was his mother, he continued to refer to her by her first name. Jones stated that she believed mother cared about O.J.P., but Jones, on behalf of DFPS, requested that mother's parental rights to O.J.P. be terminated. In Jones's opinion, mother did not have any interest in caring for O.J.P., and mother had not demonstrated an ability to meet O.J.P.'s needs. Mother was unable to provide O.J.P. with a safe environment.

As to father, Jones noted that father had visits with O.J.P. during the pendency of the case and father had been appropriate with O.J.P. during those visits. After the COVID-19 pandemic began, O.J.P.'s visits with father were "virtual[]."[12] Jones explained that there were difficulties with O.J.P.'s foster family "join[ing] the Zoom[13] meeting[s] so [that O.J.P.] could have . . . visit[s]" with father. O.J.P.'s

---

[12] *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *8 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) (noting parent had "virtual visits" with child after COVID-19 pandemic began (internal quotations omitted)); *In re A.K.P.*, No. 04-20-00305-CV, 2021 WL 356900, at *1 (Tex. App.—San Antonio Feb. 3, 2021, pet. denied) (mem. op.) (same).

[13] *See In re D.L.W.W.*, 617, S.W.3d 64, 71–73 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (noting "Zoom" constitutes "a videoconferencing platform" used to facilitate parent-child visitations COVID-19 pandemic); *see also United States v. Sheppard*, Crim. Action No. 5:17-CR-00026-TBR, 2020 WL 6534326, at *1 (W.D. Ky. Nov. 5, 2020) (mem. op. and order) (noting "Zoom" is "a video conferencing

foster family did not want to facilitate any visits with father either in person or virtually. O.J.P. referred to father by his first name.

### *O.J.P.'s Foster Mother*

O.J.P.'s foster mother testified that O.J.P. had been placed with her family since June 2019.[14] This was the third time that O.J.P. had been placed with his foster family. The first time that the foster family cared for O.J.P. was from March 2016 to October or November 2016 after he was removed from the care of mother and father. O.J.P. was one year old at the time, and he turned two years old while he was in his foster family's care. When O.J.P. was returned to the care of mother and father, he was two years old. O.J.P. was placed with the foster family again in April 2017 for about four months. O.J.P. was two years old at the time, and he turned three years old while in his foster family's care.

O.J.P.'s foster mother testified that O.J.P. had special needs. The first time that O.J.P. came into his foster family's care, in 2016, he could not talk and had a severe speech delay. His behavior was also "off." His foster mother tried to have O.J.P. evaluated for autism by a behavioral health pediatrician at that time, but he was put on a waitlist and then returned to mother's care before his foster mother

---

platform" that has been utilized during COVID-19 pandemic due to safety and health concerns surrounding in-person proceedings).

[14]    At the time of trial, O.J.P. had been in the care of his foster family for more than one year.

could have him evaluated. When O.J.P. came into his foster family's care for a second time in 2017, O.J.P.'s foster mother had him evaluated by a behavioral health pediatrician. At that time, O.J.P. was still exhibiting the same abnormal behaviors, but they were worse. O.J.P. still could not talk and had behavioral issues. His foster mother described his tantrums as "worse than tantrums," stating that they involved "a lot of screaming" and fighting. At the time, O.J.P., who was about three years old, could not feed himself or hold a spoon, fork, or cup. After O.J.P. was evaluated, he was referred to a neurologist and his foster mother had him participate in the recommended occupational, speech, and physical therapies. O.J.P. was returned to mother's care before O.J.P. was able to participate in his therapies extensively. O.J.P.'s foster mother estimated that O.J.P. was able to participate in his recommended therapies for about three months before he was removed from the foster family's care and returned to mother's care.

After O.J.P. returned to his foster family's care in 2019, his foster mother had him evaluated, and he was diagnosed with autism. He also began receiving speech therapy. Additionally, O.J.P. participated in occupational and physical therapies for a time, but those therapies were able to be stopped because his foster family was able to "teach him and get him over that hump." O.J.P.'s foster family taught him how to hold a pencil, fork, and cup. They taught O.J.P. to eat with utensils instead of his hands. O.J.P.'s foster mother noted that with speech therapy, O.J.P.'s speech

had improved a lot and his foster family could understand him "a lot better now." At the time of trial, O.J.P. was not taking any medication.

O.J.P.'s foster mother also explained that she had participated in several Admission, Review, and Dismissal ("ARD") meetings with O.J.P.'s school to discuss O.J.P.'s autism.[15] O.J.P.'s foster mother stated that the school personnel had been cooperative in trying to assist and help O.J.P. And O.J.P.'s foster mother testified that when O.J.P. was attending school in person, before the COVID-19 pandemic, she was in daily contact with school personnel about O.J.P. O.J.P. was in a "life skill[s] class" at school. O.J.P.'s foster mother believed that she could cooperate and assist with O.J.P. being evaluated or tested for "different things" in the future.

O.J.P.'s foster mother noted that when O.J.P. came back into his foster family's care in 2019, his behavior was worse and more extreme. He was still not talking and could not be understood. He screamed to communicate, fell on the floor screaming, threw things, hit, bit, spit, and kicked. He was afraid to bathe and would shovel food in his mouth using his hands to the point that he was choking and gagging. Because O.J.P. was unable to be left unsupervised, his foster parents were a part of every service that he was provided so that they could assist. The only time that someone was not watching O.J.P. was when he was sleeping. O.J.P.'s foster

---

[15] *See* TEX. EDUC. CODE ANN. § 29.005; 19 TEX. ADMIN. CODE § 89.1011(d).

mother stated that O.J.P.'s behavior had improved while in the care of the foster family.[16]

To help O.J.P., his foster family implemented a structured routine, and his foster mother noted that it was a lot of responsibility to take care of O.J.P.'s medical, physical, and emotional needs. Mondays through Fridays, O.J.P. went to school. O.J.P. was now able to wake himself up every morning between 7:00 a.m. and 7:15 a.m. He ate at the same time every day. On Mondays and Wednesdays, O.J.P. attended speech therapy sessions with his school in the afternoons. On Tuesdays and Thursdays, O.J.P. attended private speech therapy sessions in the mornings. O.J.P. ate dinner at 5:00 p.m., and at around 6:30 p.m., he picked out his pajamas and showered in his foster parents' bathroom so that he could be supervised. O.J.P. then had downtime. At 7:15 p.m., he read a story, sang a song, said his prayers, and went to bed at 7:30 p.m. He usually fell asleep at about 8:00 p.m. Because, at the time of trial, O.J.P. was attending school virtually,[17] O.J.P.'s foster mother explained

---

[16]     O.J.P.'s foster mother noted that although O.J.P.'s behavior had improved while in the foster family's care, when O.J.P. was upset, he did "things that . . . little kids do," like crying and screaming. O.J.P. was stubborn and had "some temper tantrums." But his behavior had improved during the pendency of this case, and when he had tantrums, he did not destroy property or threaten anyone.

[17]     Foster mother noted that before the COVID-19 pandemic, O.J.P. attended school in person and was at school from 8:00 a.m. to 3:05 p.m. Monday through Friday.

that she was his daily instructor and she helped him with his synchronous and asynchronous school assignments.[18]

O.J.P.'s foster mother also explained that when O.J.P. had behavioral issues, his foster parents tried to redirect him. She used a "time-in" method, rather than a "time-out," to allow O.J.P. to sit quietly and calm himself down. He would "count[] and breathe[], inhale[], exhale[] to calm down." O.J.P.'s foster mother wanted to teach O.J.P. to "self-soothe." At home, the "time-in" method worked well because O.J.P. trusted his foster family. The stability in the foster family's home also put O.J.P. in a stable place.

As to O.J.P.'s autism, O.J.P.'s foster mother stated that O.J.P. had trouble understanding and responding to social cues, and he had trouble with eye contact and making friends. He also exhibited behaviors associated with autism such as "[f]lapping" or "[w]alking on his toes." O.J.P.'s foster mother believed that O.J.P.

---

[18]    As to O.J.P.'s virtual schooling schedule, O.J.P.'s foster mother explained that O.J.P. had to log onto his computer at 8:00 a.m. to have a Zoom meeting with his teacher. After about forty minutes, he would log off and his foster mother would help O.J.P. do his assignments that needed to be turned in for the day. O.J.P. would log back onto his computer for another forty minutes to engage in instruction with his teacher. He would log off, and O.J.P.'s foster mother would facilitate O.J.P. actually turning in the assignments that he had completed that day. Then, on Mondays and Wednesdays, O.J.P. would have speech therapy sessions through his school virtually from 2:05 p.m. to 2:35 p.m. O.J.P.'s school day ended at 3:05 p.m. O.J.P.'s foster mother stated that when O.J.P. began virtual schooling from home, his foster family completely restructured their schedule to accommodate his virtual schooling.

could benefit from ABA therapy and that O.J.P "should have his own unique type of therapy and therapeutic plan." If ABA therapy was available to O.J.P., his foster mother would be willing to help facilitate conversations between school personnel and professional therapists so that O.J.P. could be provided services. O.J.P.'s foster mother thought that a program designed specifically for O.J.P. that integrated school and home would be a positive thing for O.J.P., and she would welcome that type of therapy for O.J.P.

As to the removal of O.J.P. from the foster family's home, O.J.P.'s foster mother explained that at one time during the pendency of the case, the foster family requested that O.J.P. be removed from their home. That occurred because O.J.P. was displaying behavioral issues after his visits with father and certain specific behavioral incidents happened. According to O.J.P.'s foster mother, at the time, O.J.P. was having "virtual visits" with father because of the COVID-19 pandemic, and after his visits, his behavior would regress and he would exhibit behaviors like when "he first came back . . . into" the foster family's care. Although the foster family asked for O.J.P. to be removed from the home, O.J.P.'s foster mother was still worried about the adverse effect that removing O.J.P. from the home could have on him. O.J.P.'s foster mother noted that when O.J.P. was removed from the foster family's home, it was only for seven days, and the foster family agreed to have him return. O.J.P.'s foster mother spoke to the DFPS caseworker about the difficulties

22

O.J.P. was having being in another placement, and the foster family felt that it was "the right thing" to bring him back into their home because they wanted what was best for O.J.P.

When discussing the foster family's difficulties with O.J.P.'s visits with father, O.J.P.'s foster mother noted that before the COVID-19 pandemic, O.J.P. had in-person visits with father every Wednesday, and the foster family did not prevent O.J.P. from having those visits. O.J.P. would be picked up by a DFPS caseworker and taken to the office for his visits because O.J.P.'s foster mother was working outside the home. O.J.P.'s visits with father occurred regularly until March 2020. But the situation changed during the COVID-19 pandemic because O.J.P.'s foster mother had O.J.P. and her other children at home with her all day, while she was also working remotely from home. Additionally, the number of visits with father increased. And O.J.P.'s foster mother became responsible for ensuring that O.J.P. was attending school virtually as well as participating in his therapy sessions. These changes caused the foster family to have difficulty "accommodat[ing] the extensive visitation schedule" that O.J.P. had with father. O.J.P.'s foster mother was unable to take time off of work to facilitate O.J.P.'s virtual visits with father, which would have been in addition to the time off work that she already spent helping O.J.P. navigate school virtually and attend his therapy sessions. O.J.P.'s foster mother could not "get accommodations with [her] job," and this made adhering to O.J.P.'s

scheduled virtual visits with father difficult because O.J.P.'s foster mother would have to sit in on each virtual visit due to O.J.P.'s disabilities. O.J.P.'s foster mother could not just "sit [O.J.P.] in front of [an electronic device] and let him have the call" with father. And O.J.P.'s foster mother could not work while trying to facilitate O.J.P.'s virtual visits with father because her work involved having confidential calls with her clients and she could not have those calls and help O.J.P. attend virtual visits with father at the same time. O.J.P.'s foster mother explained that O.J.P. was supposed to have multiple visits with father every week and she "didn't have enough hands-on-deck to assist" with that between O.J.P.'s own schedule, her work schedule, foster father's schedule, and her other son's school schedule. At one time, DFPS caseworker Jones came to the foster family's home to facilitate the virtual visits between O.J.P. and father, but O.J.P.'s foster mother took over facilitating the virtual visits until school started in September 2020. O.J.P.'s foster mother did not request that O.J.P.'s visits with father stop, but father stopped calling.

As to mother, O.J.P.'s foster mother explained that she is related to mother; mother is her first cousin, and they grew up together. Mother had not had any in-person or virtual visits with O.J.P. during the pendency of the case. O.J.P.'s foster mother expressed that she did not want "to deal" with mother because mother had "exhibited behaviors that [were] not safe" and O.J.P.'s foster mother did not want to put her family in an unsafe position. O.J.P.'s foster mother was concerned about

24

O.J.P. ever having visits with mother because of safety concerns for herself and her family as there had been previous physical altercations between mother and O.J.P.'s foster mother. In the past, mother had "curs[ed] . . . out" O.J.P.'s foster mother, was aggressive and threatening toward O.J.P.'s foster mother, and wanted to fight O.J.P.'s foster mother. Mother had physically attacked O.J.P.'s foster mother when they both attended the funeral of a family member in 2018. At that time, mother attacked O.J.P.'s foster mother "[i]n the church and at the gravesite," and since that time, O.J.P.'s foster mother had avoided seeing mother.

O.J.P.'s foster mother noted that mother had reached out to her during the pendency of this case by text message. In text messages, mother had told O.J.P.'s foster mother "to protect [O.J.P.] from the cartel." Mother stated that O.J.P. and O.J.P.'s foster mother were "in danger" and told O.J.P.'s foster mother to "hide" herself and O.J.P. "from the cartel." Mother sent O.J.P.'s foster mother photographs "of people whom [O.J.P.'s foster mother was] supposed to hide from" who were purportedly related to the cartel. Such text messages were sent by mother to O.J.P.'s foster mother consistently throughout the case. Mother had also made threats toward O.J.P.'s foster mother in text messages, and she had sent O.J.P.'s foster mother text messages saying that she was unstable and she "want[ed] to kill herself." Mother also reached out to other family members in the same way. When O.J.P.'s foster

mother was told that it was possible that mother could have visits with O.J.P., O.J.P.'s foster mother became concerned for her family's safety and O.J.P.'s safety.

O.J.P.'s foster mother stated that the foster family wanted to adopt O.J.P. and they loved him. He was a part of their family, and his foster parents viewed him as their son. According to O.J.P.'s foster mother, O.J.P.'s foster family was able to provide him with a safe and stable home.[19] O.J.P.'s foster mother planned to continue to take care of O.J.P. and believed that it was in O.J.P.'s best interest to remain in the care of his foster family.

### Mother's FSP

The trial court admitted into evidence a redacted copy of mother's FSP. The FSP states that DFPS wanted O.J.P. to grow up in a stable, safe, and narcotics-free environment. The FSP states that O.J.P. had positive interactions with his foster family and had a sense of belonging within the family.

As to mother, the FSP states that she "need[ed] to address her inability to prevent" O.J.P. from "being a victim of neglect" by completing parenting classes "to learn age[-]appropriate parenting skills," completing a substance abuse assessment and following its recommendations, completing random narcotics-use testing to help "address concerns with her . . . substance abuse," participating in a psychosocial

---

[19] O.J.P.'s foster mother noted that her family had been living in their current home since 2018.

26

evaluation and following its recommendations, refraining from participating in any illegal and criminal activity throughout the duration of the case, and attending and participating in all court hearings, permanency conferences, scheduled visitations, and meetings requested by DFPS and the trial court. The FSP also states that there were allegations of "power control" or violence between mother and father, and mother and father's relationship had been characterized by increased disruption of positive interactions around O.J.P., along with a lack of cooperation and emotional or verbal abuse.

Under her FSP, mother was required to, among other things: (1) obtain, pay for, and maintain appropriate housing for herself and O.J.P., (2) provide a lease agreement and allow home visits by a DFPS caseworker, (3) notify a DFPS caseworker within seventy-two hours of any move and provide names of any persons living in her home or apartment and their relationship with her, (4) obtain employment to provide for O.J.P., (5) provide a DFPS caseworker with pay stubs monthly along with the business name, phone numbers, address, supervisor name, and work schedule, (6) notify a DFPS caseworker within seventy-two hours of any changes in her employment, (7) complete approved parenting classes and provide a certification of completion no later than thirty days after the class is completed, (8) participate in a substance abuse evaluation and follow the recommendations of the evaluation, (9) participate in random narcotics-use testing, (10) refrain from

27

participating with and interacting with people who have a history of narcotics use or abuse and develop a positive and narcotics-free support system to assist in maintaining a narcotics-free lifestyle, (11) participate in a psychosocial assessment and follow all recommendations of the assessment, and (12) participate in domestic violence classes.

### *Narcotics-Use Testing Records*

The trial court admitted into evidence a copy of an order from the trial court, dated August 8, 2019, requiring mother to "[r]emain in the [c]ourtroom" to submit to narcotics-use testing on that date. The trial court also admitted into evidence copies of orders from the trial court, dated October 17, 2019 and January 30, 2020, requiring mother to report to the National Screening Center by 6:00 p.m. on October 18, 2019 and February 3, 2020 to submit to narcotics-use testing. And the trial court admitted into evidence a copy of an order from the trial court, requiring mother to report to the National Screening Center by 5:00 p.m. on March 13, 2020 to submit to narcotics-use testing as well as a copy of an order from the trial court, requiring mother to immediately report to the National Screening Center on July 31, 2020 to submit to narcotics-use testing.

Additionally, the trial court admitted into evidence records from the National Screening Center, stating that mother, during the pendency of this case, failed to

28

appear for narcotics-use testing as ordered on August 8, 2019 and October 18, 2019.[20]

### Bruce Jeffries

Bruce Jeffries testified that he is the custodian of records for the National Screening Center. According to the records of the National Screening Center, mother had not shown up for narcotics-use testing in 2019 or 2020. If she had come to the National Screening Center for narcotics-use testing in 2019 or 2020, Jeffries would have been able to find a record of that.

### Casa de Esperanza Records

The trial court admitted into evidence a copy of the 237 pages of records from Casa de Esperanza de Los Ninos, Inc. ("Casa de Esperanza") related to O.J.P. These records indicate that O.J.P. was placed in the care of Casa de Esperanza in March 2016 because mother was unstable due to homelessness,[21] could not take care of O.J.P., tested positive for marijuana use, and needed to "work services with DFPS." The records also state that mother and father had "substance abuse issues" and "domestic violence" issues. Mother reported that she and father used marijuana, and

---

[20] Other records admitted into evidence by the trial court related to mother's previous narcotics-use testing results show that mother tested positive for marijuana use in April 2017 and positive for cocaine use in September 2017.

[21] According to the records, although mother was provided information for several shelters, she "continue[d] to behave in a manner that cause[d] shelters not to agree to allow her to stay."

she "struggle[d] with drug abuse." She also reported that she was in an abusive relationship with father, stating that father was the perpetrator of physical, emotional, and sexual abuse. Mother stated that she had "a criminal history of assault," and she and father had both been convicted of assault in the past.[22] O.J.P. had witnessed domestic violence disputes between mother and father. Mother and father lacked stability and did not have an appropriate support system.

As to O.J.P., while in the care of Casa de Esperanza, he required dental work because of "dental decay" and cavities. He underwent dental surgery, under general anesthesia, and received four "caps" on his "upper four front teeth." The records also note that O.J.P. was "[v]ery delayed in all areas." He was evaluated by a speech therapist and determined to have a speech delay—a "mixed receptive/expressive language delay." (Internal quotations omitted.) And he was also evaluated by an occupational therapist and determined to have a delay in "cognitive and emotional development affected by fight/flight reactions." (Internal quotations omitted.) O.J.P. needed to be taught "basic skills" and demonstrated "delayed motor skills." Physical therapy and speech therapy twice a week for at least six months were recommended to address O.J.P.'s delays. O.J.P. was also evaluated by a

---

[22] The records show that mother had been convicted of the misdemeanor offense of assault in 2006 and sentenced to confinement for sixty days. *See* TEX. PENAL CODE ANN. § 22.01. And she was convicted of the misdemeanor offense of assault of a family member in 2014 and sentenced to confinement for twenty days. *See id.*

developmental specialist who determined that he "scored at or near age level for cognitive and fine motor skills," but his "receptive and expressive language skills were significantly below age level." (Internal quotations omitted.)

The records state that in April 2016, O.J.P. was placed with his foster family and left the care of Casa de Esperanza.

### *Santa Maria Hostel Records*

The trial court admitted into evidence copies of two sets of records from Santa Maria Hostel—records from 2016 and records from 2020. The records from 2020 indicate that mother was admitted to Santa Maria Hostel on August 6, 2020—a few months before trial. Mother was thirty-three years old at the time. Mother was unsuccessfully discharged from Santa Maria Hostel on August 18, 2020—twelve days later.

At Santa Maria Hostel, mother reported a history of methamphetamine and marijuana use and stated that she had used both narcotics in the last thirty days before admission to Santa Maria Hostel. Mother first used marijuana when she was seventeen years old, and she first used methamphetamine when she was thirty-one years old. Mother reported that she was using methamphetamine on a daily basis. Mother had "a history of experiencing previous withdrawal symptoms." The records also show that mother responded "[y]es" to the following questions about her narcotics use:

31

- "Have you experienced a non-fatal overdose?";

- "Have you ever been administered naloxone or Narcan?";

- "Have you gotten sick or had withdrawal if you quit drinking or missed taking a drug?";

- "Have you used larger amounts of alcohol or drugs or used them for a longer time than you had intended?";

- "Have you tried to cut down on alcohol or drugs and were unable to do it?";

- "Have you spent a lot of time getting alcohol or drugs, using them, or recovering from their use?";

- "Have you gotten so high or sick from alcohol or drugs that it . . . [k]ept you from doing work, going to school, or caring for children?";

- Have you gotten so high or sick from alcohol or drugs that it . . . [c]aused physical health or medical problems?";

- "Have you spent less time at work, school, or with friends so that you could drink or use drugs?";

- "Has your use of alcohol or drugs caused . . . [e]motional or psychological problems?";

- "Has your use of alcohol or drugs caused . . . [p]roblems with family, friends, work, or police?";

- "Have you increased the amount of alcohol or drugs you were taking so that you could get the same effect as before?"; and

- "Have you continued drinking or taking a drug to avoid withdrawal or to keep from getting sick?"

The records show that mother was diagnosed with severe amphetamine use disorder and severe cannabis use disorder. The records state that mother appeared to "remain[] ambivalent about long-term change."

Mother also reported at Santa Maria Hostel that she was unemployed and homeless. She stated that she was "sleeping on the streets" and "eating from trash can[s]." And she reported that she had previously been diagnosed with post-traumatic stress disorder, bipolar disorder, depression, anxiety, schizophrenia, paranoia, psychosis, and a sleep disorder, but she had not taken medication in over a year. Further, mother stated that she had a history of "Intimate Partner Violence" and that she had been "bullied" at home. Mother stated that she was "married to a meth user and her fianc[é] [was] a drug dealer." "Both of the men in her life [were] abusive toward her" and her "husband [was] abusive to [her] son as well." Mother did not "communicate with [her] family."

The records additionally indicate that mother was unsuccessfully discharged from Santa Maria Hostel after "repeatedly going through filing cabinets and violating staff and client privacy." Mother was reportedly looking for her cellular telephone. She asked a "night shift tech for a snack and when the [tech] left the front of the tech station to get it[,] [mother] began going through the filing cabinet that ha[d] the clients['] cell[ular] [tele]phones in it." Mother became upset and angry when she was "caught" by staff members. Mother also "kicked a pregnant cat" after

being confronted. During her stay at Santa Maria Hostel, mother "bullied and manipulated clients by intimidation and threats," and mother "lash[ed] out at other clients." Mother was involved in an altercation with her roommates. Mother "pour[ed] water on the bed of her roommates" and was "accused of stealing food from her roommates." Mother was also "caught turning the water off at the toilet." Mother did not "follow the rules of the program" and engaged in "violate behavior."

The 2016 records from Santa Maria Hostel show that mother was admitted to Santa Maria Hostel on February 22, 2016. She was unsuccessfully discharged on March 1, 2016—seven days later.[23] The records state that mother reported using marijuana and alcohol in the past year and that she lasted used alcohol and marijuana two days before being admitted to Santa Maria Hostel. Mother reported that, at the time, O.J.P. was one year old. DFPS had referred mother to Santa Maria Hostel for treatment.

The records also show that mother reported at Santa Maria Hostel that she first used alcohol when she was thirteen years old and she usually drank four glasses of wine "per episode." Mother first used marijuana at seventeen years old, and she reported that she used it daily to avoid "feel[ing] what was going on around her and in her life." The records show that mother responded, "[y]es," to the following questions:

---

[23] Mother turned twenty-nine years old while she was at Santa Maria Hostel in 2016.

34

- "Have you used larger amounts of alcohol and drugs or used them for a longer time than you had intended?";

- "Have you spent a lot of time getting alcohol or drugs, using them, or recovering from their use?";

- "Has your use of alcohol or drugs caused . . . [p]roblems with family, friends, work, or police?"; and

- "Have you increased the amount of alcohol or drugs you were taking so that you could get the same effect as before?"

Mother also stated that she frequently used "more than one substance at a time." Mother was diagnosed with severe alcohol use disorder and severe cannabis use disorder.

Additionally, mother reported that she was homeless, unemployed, and had "no family support." Mother stated that she was married and was in an abusive relationship that involved physical and emotional abuse.

Mother was unsuccessfully discharged from Santa Maria Hostel for failing to comply with the "rules and regulations of the program" and for "having aggressive behaviors towards staff [members] and peers." Mother "alienated herself from other[s] because of her dominating and controlling manner while in the treatment setting." She "failed to acknowledge the significant problems that ha[d] resulted from her addictive behavior as well as her [unwillingness] to follow the rules and regulations of the program." Mother "focused away from her addiction problems and consistently focus[ed] on how other[s] ha[d] been unfair to her." "Despite

35

having an understanding of the treatment process rules and regulations of the program, [mother] refused to remain in compliance," even though "numerous attempts" to encourage her to do so were made by her counselor, the clinical team, and her DFPS caseworker.

## Sufficiency of Evidence

In her first issue, mother argues that the trial court erred in terminating her parental rights to O.J.P. because the evidence is factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of O.J.P. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

A parent's right to "the companionship, care, custody, and management" of her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary

termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a

37

reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

Mother argues that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of O.J.P. because, based on all of the evidence, considered in light of the factors in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), and Texas Family Code section 263.307, "no rational trier of fact could have formed a strong conviction or belief that severing the parent-child bond [was] in O.J.P.'s best interest."

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b); *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (both elements must be established).

The best-interest analysis evaluates the best interest of the child. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). It is presumed that the prompt and permanent

38

placement of the child in a safe environment is in his best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parent. *See In re M.A.A.*, 2021 WL 1134308, at *20; *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In determining whether the termination of mother's parental rights was in the best interest of the child, we may consider several factors, including: (1) the desires of the child; (2) the current and future physical and emotional needs of the child; (3) the current and future emotional and physical danger to the child; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the child by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley*, 544 S.W.2d at 371–72; *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J.G.S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

The same evidence of acts and omissions used to establish grounds for termination under Texas Family Code section 161.001(b)(1) may also be relevant to determining the best interest of the children.[24] *See In re C.H.*, 89 S.W.3d at 28; *In*

---

[24] The trial court found, as grounds for termination of the parent-child relationship, that mother knowingly placed, or knowingly allowed O.J.P. to remain, in conditions or surroundings which endangered his physical or emotional well-being; engaged in conduct, or knowingly placed O.J.P. with persons who engaged in conduct, which endangered his physical or emotional well-being; constructively abandoned O.J.P., who had been in the managing conservatorship of DFPS for not less than six months, DFPS made reasonable efforts to return O.J.P. to mother, mother did not regularly visit or maintain significant contact with O.J.P., and mother demonstrated an inability to provide O.J.P. with a safe environment; and failed to comply with the provisions of a court order that specifically established the actions necessary for mother to obtain the return of O.J.P. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O). Mother does not assert, as an issue on appeal, that the evidence was legally or factually insufficient to support the trial court's findings under Texas Family Code Section 161.001(b)(1). *See* TEX. R. APP. P. 38.1(f) (appellant's "brief must state concisely all issues or points presented for review"); *Gonzales v. Thorndale Coop. Gin & Grain Co.*, 578 S.W.3d 655, 657 (Tex. App.—Houston

*re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1. Child's Desires

When mother's parental rights were terminated, O.J.P. was about six-and-a-half years old. He did not directly express a desire as to whether he wished to return to mother's care or remain in the care of his foster family. DFPS caseworker Jones testified that O.J.P. referred to mother by her first name.

When there is no specific evidence of a child's desires and a child is too young to express those desires, a fact finder may consider evidence that the child is bonded

---

[14th Dist.] 2019, no pet.) ("As the appellant, [she] bore the responsibility to frame the issues and arguments for h[er] appeal; and we have no discretion to create an issue . . . not raised in the appellant's brief."); *Point of Error*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "point of error" as "[a]n alleged mistake by a lower court asserted as a ground for appeal"); *see also In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) ("*When a parent has presented the issue on appeal*, an appellate court that denies review of a section 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." (emphasis added)); *In re D.T.*, 593 S.W.3d 437, 439 n.3 (Tex. App.—Texarkana 2019) ("[T]he Texas Supreme Court has held that due process demands that we review the evidence supporting findings under Grounds D and E *[only] when they are challenged on appeal* . . . ." (emphasis added), *aff'd*, 625 S.W.3d 62 (Tex. 2021).

with his foster family, receives good care in his current placement, and has spent minimal time with a parent. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *20 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). At the time of trial, O.J.P. had been placed with his foster family for more than one year. This was the third time that O.J.P. had been placed with his foster family since he was one year old. Jones testified that mother had not visited O.J.P. during the pendency of this case. *See In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *19 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (considering evidence that parent missed visits with children when evaluating children's desires).

Father estimated that O.J.P. had spent about "half his life" living with his foster family. *See In re L.M.N.*, 2018 WL 5831672, at *20 (considering young child had spent majority of life with foster parents). While in the care of his foster family, O.J.P. "ha[d] received everything that [mother and father had] wanted to give him in a much quicker time frame as far as his schooling, his medical [treatment], [and] his therapies." Father believed that O.J.P. was excelling in his placement with his foster family, and O.J.P. had thrived more with his foster family than he had in the care of mother and father. Father noted that O.J.P.'s speech had improved

42

significantly while in the care of his foster family, which father believed was the result of the care that O.J.P. had been receiving from his foster family.

Jones testified that O.J.P.'s foster family was meeting his physical and emotional needs, and she described O.J.P. as "a happy kid." O.J.P.'s foster family took him to dental appointments, ensured that he received his required therapies, and spent time engaging him in therapeutic activities outside of his normal therapy sessions. Jones noted that O.J.P's improvement during the pendency of the case was due to his foster family "tak[ing] care of him and ensur[ing] that he ha[d] everything [that] he need[ed] in order to be successful with []his therap[ies]." O.J.P.'s foster family supported O.J.P. receiving services that would help his educational process and his social skills, and the foster family was willing to work with "other people," such as "Disability Rights Texas [and] local authority service coordinators[,] to help bring [any] services [that O.J.P. needed] into the home." Jones believed that O.J.P.'s foster family had the "temperament and the wherewithal to be able to work with [O.J.P.'s] school and get the services in place." Whatever plan was put in place for O.J.P., his foster family would "follow the plan." His foster family had indicated that they enjoyed working with the personnel at O.J.P's school and that O.J.P. liked his school.

Jones noted that each of the three times that O.J.P. had been removed from mother and father's care in the six-and-a-half years of his life, he had stayed with

43

his same foster family. O.J.P.'s foster family wanted to adopt him. Mother's FSP states that O.J.P. had positive interactions with his foster family and a sense of belonging within the family.

O.J.P.'s foster mother testified that her family had cared for O.J.P. each of the three times that he had been removed from mother and father's care. The first time O.J.P. came into her care, he was one year old. O.J.P.'s foster family wanted to adopt him, and they loved him. O.J.P.'s foster mother stated that he was part of their family, and his foster parents viewed him as their son. The foster family was able to provide O.J.P. with a safe and stable home. O.J.P.'s foster mother extensively detailed the medical, therapeutic, and educational needs of O.J.P. that the foster family had addressed and continued to address in order to help O.J.P thrive. *See In re L.M.N.*, 2018 WL 5831672, at *20 (considering evidence children doing well in placement with foster parents, who were meeting children's needs); *In re M.L.R-U., Jr.*, 517 S.W.3d 228, 238 (Tex. App.—Texarkana 2017, no pet.) (considering evidence foster family provided safe and healthy environment when determining children's desires).

## 2. Current and Future Physical and Emotional Needs and Current and Future Physical and Emotional Danger

### a. *Safe and Stable Home*

A child's need for a safe and stable home is a paramount consideration in assessing the best interest of the child. *See In re L.W.*, 2019 WL 1523124, at *18;

44

*see also* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14 Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs); *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (in children's best interest to be raised in consistent, stable, and nurturing environment).

Mother, in her briefing, acknowledged that she "still s[ought] stability," "had not demonstrated stability in housing," and "struggled throughout the case with homelessness." There is also no evidence in the record that mother is able to provide O.J.P. with a safe and stable home. *See In re P.S.*, No. 02-16-00458-CV, 2017 WL 1173845, at *9 (Tex. App.—Fort Worth Mar. 30, 2017, no pet.) (mem. op.) (children's basic needs include safe, stable, and nurturing home environment); *see also Adams*, 236 S.W.3d at 280 (parent's history of failing to provide children with "stable and nurturing environment" demonstrates termination of parental rights in children's best interest). Mother reported, a few months before trial, in August 2020 at Santa Maria Hostel, that she was homeless,[25] unemployed, "sleeping on the

---

[25] Mother also had a history of being unable to provide a safe and stable home for O.J.P. In 2016, O.J.P. was placed in the care of Casa de Esperanza and then in the care of his foster family because mother was unstable due to homelessness and could not take care of O.J.P. The records from Casa de Esperanza state that although mother was provided information for several shelters, she "continue[d] to behave in

streets," and "eating from trash can[s]." She did not "communicate with [her] family," and her fiancé was "a drug dealer." DFPS caseworker Jones testified that mother told her she was homeless, did not provide Jones with a leasing agreement for any housing arrangement, and did not provide any pay stubs indicating that she was employed. Jones described mother's "presence in th[e] case" as "sporadic," and at times during the pendency of the case, DFPS could not locate mother. Jones did not believe that mother could provide O.J.P. with a safe environment. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(D) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrates adequate parenting skills, including by providing child with "a safe physical home environment"); *In re D.R.M.*, No. 13-17-00320-CV, 2017 WL 6616738, at *5–6 (Tex. App.—Corpus Christi–Edinburg Dec. 28, 2017, no pet.) (mem. op.) (where parent admitted to being homeless and being unable to provide stable housing to children, record established parent exposed children to emotional and physical danger and could not provide for their emotional and physical needs now or in future); *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.— Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.) ("A parent who lacks stability, income, and a home is unable to provide for a child's emotional and

a manner that cause[d] shelters not to agree to allow her to stay." Two months before trial, mother told father that she was homeless.

46

physical needs."); *In re D.C.*, 128 S.W.3d 707, 717 (Tex. App.—Fort Worth 2004, no pet.) (evidence of parent's inability to provide stable home and remain gainfully employed supports trial court's finding termination in child's best interest).

Mother also sent disturbing text messages during this case to Jones and O.J.P.'s foster mother. Mother sent Jones "random text messages asking for welfare checks" on O.J.P., stating that O.J.P. was "in danger" or that mother was "in danger." Mother stated that she "ha[d] been taken against her will," "the cartel [was] out to get her," and she "need[ed] witness protection." Mother also reached out to O.J.P.'s foster mother during the pendency case, sending O.J.P.'s foster mother text messages stating that O.J.P. and O.J.P.'s foster mother were "in danger" and telling O.J.P.'s foster mother to "hide" herself and O.J.P. "from the cartel." Mother sent O.J.P.'s foster mother photographs "of people whom [O.J.P.'s foster mother was] supposed to hide from" who were purportedly related to the cartel. Such text messages were sent to O.J.P.'s foster mother consistently throughout this case. Mother also made threats toward O.J.P.'s foster mother in text messages, and she sent O.J.P.'s foster mother text messages saying that she was unstable and she "want[ed] to kill herself." Mother also reached out to other family members in the same way. *See Jordan v. Dossey*, 325 S.W.3d 700, 723–24 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("A parent's mental instability . . . may contribute to a finding that the parent engaged in a course of conduct that endangered a child's

47

physical or emotional well-being."); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("[T]he trial court could have considered [parent's] mental state as endangering [the child's] well-being.").

      b.    *Violence and Abuse*

A child's exposure to violence in the home undermines the safety of the home environment and is relevant when considering the best interest of the child. *See In re L.W.*, 2019 WL 1523124, at \*19; *In re A.K.*, Nos. 07-17-00353-CV, 07-17-00354-CV, 2018 WL 912703, at \*5 (Tex. App.—Amarillo Feb. 15, 2018, pet. denied) (mem. op.); *see also In re O.N.H.*, 401 S.W.3d 681, 685 (Tex. App.—San Antonio 2013, no pet.) ("[I]t [is] a form of abuse for the children to be exposed to an environment where physical abuse occurred even if it was not directed toward them."). Further, a parent's violent behavior while a child is in the home places the child in severe emotional danger. *See In re S.B.*, 207 S.W.3d 877, 886–87 (Tex. App.—Fort Worth 2006, no pet.). A parent's past performance as a parent is relevant to a determination of her present and future abilities to provide for a child. *See In re C.H.*, 89 S.W.3d at 28; *In re L.W.*, 2019 WL 1523124, at \*19; *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (trial court may measure parent's future conduct by past conduct); *see also Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.)

48

("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

It is undisputed that mother and father had an abusive relationship, including while O.J.P. was in their care. Father testified that O.J.P. had been removed from the care of mother and father in the past because of "domestic issues," and father stated that he had "a history of domestic violence with" mother. *See In re N.J.H.*, 575 S.W.3d 822, 835 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (history of domestic violence supports trial court's finding that termination of parental rights in child's best interest); *D.N. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00658-CV, 2016 WL 1407808, at *2 (Tex. App.—Austin Apr. 8, 2016, no pet.) (mem. op.) ("[D]omestic violence may constitute endangerment, even if the violence is not directed at the child."). Mother and father got into physical fights, and they both hit each other on multiple occasions. At times, O.J.P. was present for the fights between mother and father. *See In re J.S.-A*, No. 01-17-00491-CV, 2018 WL 891236, at *8 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, pet. denied) (mem. op.) (evidence of violence in home supports finding placement of children with parent likely to subject them to emotional and physical danger now and in future). Mother and father sustained minor bruising from their physical fights. Father stated that mother had assaulted him in from of O.J.P. and mother had been "violent" with him. Father believed that his and mother's narcotics use contributed

to their physical fights. *See* TEX. FAM. CODE ANN. § 263.307(b)(7) (in determining whether parent able to provide child with safe environment, considering history of abusive and assaultive conduct by child's family and others with access to child's home); *In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *16 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (considering evidence of mother's history of engaging in violent and abusive conduct in analyzing current and future emotional danger to child); *Clements v. Haskovec*, 251 S.W.3d 79, 87 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (in parental-termination cases, evidence that parent in past engaged in abusive conduct permits inference parent will continue behavior in future).

During his testimony, father described an incident in 2018 involving mother. The LCPD called father to come pick up O.J.P. from the LCPD station because mother had "got[ten] into an altercation with whoever she was living with and . . . the cops came and they arrested her." *See In re A.K.T.*, 2018 WL 6423381, at *16 (considering evidence that parent's violent conduct had caused her to be arrested and "jail[ed]" in analyzing current and future emotional and physical danger to child (alteration in original) (internal quotations omitted)); *In re B.J.*, No. 01-15-00886-CV, 2016 WL 1389054, at *12 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) (considering evidence of parent's criminal record in determining present and future emotional and physical danger to children); *In re*

50

*T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (evidence of parent's criminal history may support trial court's finding termination of parental rights in children's best interest); *see also In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child."). Mother told father that she was intoxicated at the time. Father did not believe that O.J.P. would be safe if he was returned to mother's care. *See In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) ("Evidence of past misconduct . . . can be used to measure a parent's future conduct."); *Schaban-Maurer*, 238 S.W.3d at 824 ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

Mother's FSP states that there were allegations of "power control" or violence between mother and father, and mother and father's relationship had been characterized by increased disruption of positive interactions around O.J.P., along with a lack of cooperation and emotional or verbal abuse. DFPS caseworker Jones testified that, as part of her FSP, mother was required to participate in domestic violence classes, but she did not do so.

O.J.P.'s foster mother also testified that she believed that mother had "exhibited behaviors that [were] not safe," and she felt that contact with mother put

51

her family in an unsafe position. O.J.P.'s foster mother explained that there had been physical altercations between her and mother in the past. According to O.J.P.'s foster mother, mother had "curs[ed] . . . out" O.J.P.'s foster mother and had physically attacked O.J.P.'s foster mother when they both attended the funeral of a family member in 2018. Mother attacked O.J.P.'s foster mother "[i]n the church and at the gravesite," and since that time, O.J.P.'s foster mother had avoided seeing mother. *See In re A.K.T.*, 2018 WL 6423381, at *12 (parent's lack of self-control and propensity for violence may be considered as evidence of endangerment); *Schaban-Maurer*, 238 S.W.3d at 824 ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

Since 2016, mother has reported, as evidenced by the Casa de Esperanza records and the Santa Maria Hostel records, that she and father had engaged in domestic violence. Mother reported that she was in an abusive relationship with father and stated that father was the perpetrator of physical, emotional, and sexual abuse. Mother acknowledged that O.J.P. had witnessed domestic violence between her and father. Mother stated that she had been "bullied" at home and had a history of "Intimate Partner Violence." *See In re L.W.*, 2019 WL 1523124, at *14 ("[A]busive conduct by a parent or other person in the children's home may produce an environment that endangers the physical and emotional well-being of the

52

children."). A few months before trial, at Santa Maria Hostel, mother reported that she was "married to a meth user and her fianc[é] [was] a drug dealer." "Both of the men in her life [were] abusive toward her," and her "husband [was] abusive to [her] son as well." *See id.* at *13, *20 ("A parent endangers her children by accepting the endangering conduct of other people."); *Jordan*, 325 S.W.3d at 721 ("[A] child is endangered when the environment creates a potential for danger which the parent is aware of but disregards.").

Additionally, the records from Santa Maria Hostel indicate that mother was unsuccessfully discharged from Santa Maria Hostel in August 2020 after "repeatedly going through filing cabinets and violating staff and client privacy." When mother was "caught" by staff members, she became upset and angry and "kicked a pregnant cat." During her stay at Santa Maria Hostel in August 2020, mother "bullied and manipulated clients by intimidation and threats," and mother "lash[ed] out at other clients." Mother was involved in an altercation with her roommates. *See In re A.K.T.*, 2018 WL 6423381, at *12 (parent's lack of self-control and propensity for violence may be considered as evidence of endangerment); *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *13 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.) (evidence of parent's aggressive and hostile behavior throughout case supported trial court's finding termination of parental rights was in children's best interest). Mother "pour[ed] water on the bed of her

roommates" and was "accused of stealing food from her roommates." Mother was also "caught turning the water off at the toilet." Previously, in 2016, mother was unsuccessfully discharged from Santa Maria Hostel for failing to comply with the "rules and regulations of the program" and for "having aggressive behaviors towards staff [members] and peers." *See In re A.K.T.*, 2018 WL 6423381, at *12 (parent's lack of self-control and propensity for violence may be considered as evidence of endangerment); *Schaban-Maurer*, 238 S.W.3d at 824 ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

Mother has been convicted of the offense of assault at least twice. *See In re A.K.T.*, 2018 WL 6423381, at *16 (considering evidence that parent's violent conduct had caused her to be arrested and "jail[ed]" in analyzing current and future emotional and physical danger to child (alteration in original) (internal quotations omitted)); *In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *19 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.) (parent's criminal record revealed pattern of violent behavior that could put children at risk of harm); *In re B.J.*, 2016 WL 1389054, at *12 (considering evidence of parent's criminal record in determining present and future emotional and physical danger to children); *In re T.L.S.*, 2012 WL 6213515, at *6 (evidence of parent's criminal history may support trial court's finding termination

of parental rights in children's best interest); *see also In re R.W.*, 129 S.W.3d at 739 ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child.").

c. *Alcohol and Narcotics Use*

Illegal narcotics use by a parent supports a conclusion that the child's surroundings endanger his physical or emotional well-being. *In re L.W.*, 2019 WL 1523124, at *20; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Further, a parent endangers her child by accepting the endangering conduct of other people. *In re L.W.*, 2019 WL 1523124, at *13, *20; *Jordan*, 325 S.W.3d at 721 ("[A] child is endangered when the environment creates a potential for danger which the parent is aware of but disregards."). This includes a parent's exposure of her child to illegal narcotics use by a person in the child's home. *In re L.W.*, 2019 WL 1523124, at *20.

According to mother, she began using alcohol at thirteen years old, marijuana at seventeen years old, and methamphetamine at thirty-one years old.[26] *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (parent's use of narcotics and its effect on her ability to parent qualifies as endangering conduct); *In re M.R.R.*, No. 10-15-00303-CV, 2016 WL 192583, at *5 (Tex. App.—Waco Jan. 14, 2016, no pet.) (mem. op.) ("A parent's continued drug use demonstrates an inability to provide for

---

[26] O.J.P. was born when mother was twenty-seven years old.

55

the child's emotional and physical needs and to provide a stable environment for the child."); *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Illegal drug use creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting."). At the time of trial, mother was thirty-three years old. A few months before trial, in August 2020, mother was diagnosed with severe amphetamine use disorder and severe cannabis use disorder. Mother reported at Santa Maria Hostel that she had used methamphetamine and marijuana in the thirty days before her admission on August 6, 2020—in other words, during the pendency of this case. Mother admitted to having "a history of experiencing previous withdrawal symptoms" related to her narcotics use, and she responded "[y]es" to the following questions about her use:

- "Have you experienced a non-fatal overdose?";

- "Have you ever been administered naloxone or Narcan?";

- "Have you gotten sick or had withdrawal if you quit drinking or missed taking a drug?";

- "Have you used larger amounts of alcohol or drugs or used them for a longer time than you had intended?";

- "Have you tried to cut down on alcohol or drugs and were unable to do it?";

- "Have you spent a lot of time getting alcohol or drugs, using them, or recovering from their use?";

- "Have you gotten so high or sick from alcohol or drugs that it . . . [k]ept you from doing work, going to school, or caring for children?";

- Have you gotten so high or sick from alcohol or drugs that it . . . [c]aused physical health or medical problems?";

- "Have you spent less time at work, school, or with friends so that you could drink or use drugs?";

- "Has your use of alcohol or drugs caused . . . [e]motional or psychological problems?";

- "Has your use of alcohol or drugs caused . . . [p]roblems with family, friends, work, or police?";

- "Have you increased the amount of alcohol or drugs you were taking so that you could get the same effect as before?"; and

- "Have you continued drinking or taking a drug to avoid withdrawal or to keep from getting sick?"

Mother also stated that she was married to "a meth user" and "her fianc[é] [was] a drug dealer." The Santa Maria Hostel records state that in August 2020, mother appeared to be "ambivalent about long-term change." Mother was unsuccessfully discharged from Santa Maria Hostel twelve days after she was admitted.

In 2016, mother reported to Casa de Esperanza that she "struggle[d] with drug abuse," and she sought treatment at Santa Maria Hostel. Mother was admitted to Santa Maria Hostel on February 22, 2016 and was unsuccessfully discharged from the rehabilitation center seven days later. At the time, O.J.P. was one year old.

Mother reported that she had been using alcohol and marijuana. Mother stated that she used marijuana to avoid "feel[ing] what was going on around her and in her life" and that she frequently used "more than one substance at a time." Mother responded "[y]es" to the following questions about her alcohol and narcotics use:

- "Have you used larger amounts of alcohol and drugs or used them for a longer time than you had intended?";

- "Have you spent a lot of time getting alcohol or drugs, using them, or recovering from their use?";

- "Has your use of alcohol or drugs caused . . . [p]roblems with family, friends, work, or police?"; and

- "Have you increased the amount of alcohol or drugs you were taking so that you could get the same effect as before?"

Mother was diagnosed with severe alcohol use disorder and severe cannabis use disorder. *See In re M.R.R.*, 2016 WL 192583, at *5 ("A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child."). Mother was unsuccessfully discharged from Santa Maria Hostel in 2016 for failing to comply with the "rules and regulations of the program" and for "having aggressive behaviors towards staff [members] and peers." Mother "alienated herself from other[s] because of her dominating and controlling manner while in the treatment setting." She "failed to acknowledge the significant problems that ha[d] resulted from her addictive behavior as well as her [unwillingness] to follow the rules and regulations of the

program." Mother "focused away from her addiction problems and consistently focus[ed] on how other[s] ha[d] been unfair to her." "Despite having an understanding of the treatment process rules and regulations of the program, [mother] refused to remain in compliance," even though "numerous attempts" to encourage her to do so were made by her counselor, the clinical team, and her DFPS caseworker.

Father also testified that he and mother used marijuana "[a] few times a week" in 2017 when O.J.P. was in their care. Although O.J.P was then removed from mother and father's care, when he was returned nine to twelve months later, mother and father started using marijuana again. *See In re M.R.R.*, 2016 WL 192583, at *5 ("A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child."); *In re O.N.H.*, 401 S.W.3d at 684 (parent endangers child by allowing child to have "continued exposure to the other parent's uncontrolled drug habit").

According to father, in 2019, he and mother started using methamphetamine. *In re M.R.R.*, 2016 WL 192583, at *5 ("A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child."); *In re O.N.H.*, 401 S.W.3d at 684 (parent endangers child by allowing child to have "continued exposure to the other parent's uncontrolled drug habit"). Father admitted to using narcotics with mother while

59

O.J.P. was in another room, and he stated that it happened "often." In 2019, father reported to law enforcement officers that mother left O.J.P. in the living room while she used narcotics in the bathroom. Father did not think it was in O.J.P.'s best interest for him and mother to use narcotics while O.J.P. was present. *See In re S.B.*, 207 S.W.3d at 886 (parent's poor judgment may be considered in determining child's best interest); *see also In re D.M.*, 452 S.W.3d 462, 471–74 (Tex. App.—San Antonio 2014, no pet.) (considering children's exposure to narcotics use in holding evidence sufficient to support best-interest finding); *In re J.W.*, No. 2-08-211-CV, 2009 WL 806865, at *5, *7 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (same). According to father, when mother used methamphetamine, her "entire demeanor w[as] different." She would tell father "that she would hear . . . the neighbors through the walls talking about her," and she did not act "normal." Father observed mother's abnormal behavior "[a]bout every other day or so" beginning in February 2019. Father believed that mother's methamphetamine use caused O.J.P. "to be abused or neglected" because mother would not get Medicaid coverage for O.J.P. "because she was afraid that she would get noticed by [law enforcement]" and "she had warrants." So, mother would "neglect . . . provid[ing] [O.J.P. with] stuff, like insurance and dental [work]" even though she was O.J.P.'s custodial parent at the time. The last time that father saw mother using methamphetamine was in March 2019, on the day that O.J.P. was removed from the care of mother and father.

As part of her FSP, mother was required to participate in random narcotics-use testing, which she failed to do during the pendency of this case. *See In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (parent's "refusal to submit to the drug test may be treated . . . as if he had tested positive for drugs"); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (fact finder could infer that parent's failure to submit to court-ordered narcotics-use testing indicated that she was avoiding testing because she was using narcotics); *see also In re T.L.S.*, 2012 WL 6213515, at *6 (considering evidence of parent's refusal to take court-ordered narcotics-use test in determining best interest of child).

### d. *Criminal History*

A parent's criminal history is relevant in analyzing the present and future emotional and physical danger to a child and whether a parent is capable of providing a safe and stable home for her child. *See In re J.S.B.*, 2017 WL 6520437, at *18–19. Notably, "[a]s a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child." *In re R.W.*, 129 S.W.3d at 739.

As part of her FSP, mother was required to refrain from participating in any illegal and criminal activity during the pendency of this case, which she failed to do. *See In re C.A.B.*, 289 S.W.3d at 885 (considering evidence that parent continued to

61

engage in criminal activity even though she knew her parental rights were in jeopardy). A copy of a criminal complaint and a copy of a judgment of conviction, admitted into evidence at trial, show that mother, during the pendency of this case, committed a criminal offense in September 2019. Related to the September 2019 criminal offense, mother pleaded guilty to the state-jail felony offense of theft,[27] and the trial court assessed her punishment at confinement for 100 days. *See In re B.J.*, 2016 WL 1389054, at *11–12 (considering evidence of parent's criminal record and narcotics use in assessing present and future emotional and physical danger to children); *In re T.L.S.*, 2012 WL 6213515, at *6 (evidence of parent's criminal history may support trial court's finding termination of parental rights in children's best interest); *see also In re R.W.*, 129 S.W.3d at 739.

Still yet, records from Casa de Esperanza indicate that mother was previously convicted of the misdemeanor offense of assault in 2006 and sentenced to confinement for sixty days. *See* TEX. PENAL CODE ANN. § 22.01. And she was convicted of the misdemeanor offense of assault of a family member in 2014 and sentenced to confinement for twenty days. *See id.*; *see also In re A.K.T.*, 2018 WL 6423381, at *16 (considering evidence that parent's violent conduct had caused her to be arrested and "jail[ed]" in analyzing current and future emotional and physical danger to child (alteration in original) (internal quotations omitted)); *In re J.S.B.*,

---

[27] *See* TEX. PENAL CODE ANN. § 31.03 ("Theft").

2017 WL 6520437, at *19 (parent's criminal record revealed pattern of violent behavior that could put children at risk of harm); *In re Z.L.W.*, No. 01-12-00736-CV, 2013 WL 396270, at *5 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, no pet.) (mem. op.) (parent's pattern of committing criminal offenses constituted evidence of current and future danger to child); *In re A.M.*, 385 S.W.3d at 82 ("Evidence of past misconduct . . . can be used to measure a parent's future conduct."). Mother reported to Casa de Esperanza in 2016 that she and father had both been convicted of the offense of assault in the past.

e. *Medical and Dental Care of O.J.P.*

A child's basic needs include routine medical and dental care. *See In re K.S.O.B.*, 2019 WL 1246348, at *19; *In re P.S.*, 2017 WL 1173845, at *9. In deciding that termination of parental rights is in the best interest of the child, the trier of fact may consider evidence that a parent neglected to seek appropriate medical treatment for her child. *See In re K.S.O.B.*, 2019 WL 1246348, at *19; *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12)(A), (F) (considering whether parent demonstrates adequate parenting skills, by providing child with adequate health and nutritional care and understanding child's needs, in determining whether parent able to provide child with safe environment). Likewise, the trier of fact may infer from a parent's past

63

inattention to her child's medical needs that such inattention will continue in the future. *See In re K.S.O.B.*, 2019 WL 1246348, at \*19; *In re L.G.R.*, 498 S.W.3d 195, 205–06 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re J.R.W.*, 2013 WL 507325, at \*9; *see also In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2003, pet. denied) (fact finder may infer that past conduct endangering child's well-being may recur in future if child returned to parent).

When O.J.P. entered DFPS's care in 2019, he "ha[d] some pretty serious dental issues" that required "significant dental care." DFPS caseworker Jones stated that O.J.P. required invasive medical procedures and dental treatment when he entered DFPS's care. *See In re J.L.B.*, 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011, no pet.) (holding evidence supported finding termination of parental rights in children's best interest and noting "deteriorated condition" of children's teeth when they entered foster mother's care). Father testified that O.J.P. had never seen a primary care physician or a pediatrician while in the care of mother and father. Mother also had allowed O.J.P.'s Medicaid coverage to "lapse" while he was in her care. *See C.S. v. Tex. Dep't of Family & Protective Servs.*, No. 03-17-00229-CV, 2017 WL 3471072, \*6–7 (Tex. App.—Austin Aug. 9, 2017, no pet.) (mem. op.) (considering evidence parent allowed Medicaid coverage to lapse in holding evidence sufficient to support trial court's finding termination of rights in child's best interest). According to father, because of mother's methamphetamine use, she

would not get Medicaid coverage for O.J.P. "because she was afraid that she would get noticed by [law enforcement]" and "she had warrants." So, mother "neglect[ed] . . . provid[ing] [O.J.P. with] stuff, like insurance and dental [work]."

In 2016, when O.J.P., at one year old, was placed in the care of Casa de Esperanza after being in the care of mother, he required dental work because of "dental decay" and cavities. He required dental surgery, under general anesthesia, and received four "caps" on his "upper four front teeth."

  f.  *Special Needs of O.J.P.*

O.J.P. was diagnosed with autism, an intellectual disability, and a speech impairment or delay. He receives special services through his school, including speech therapy, and he receives private speech therapy that his foster family helps to facilitate. According to DFPS caseworker Jones, O.J.P.'s foster family spends a lot of time engaging him in therapeutic activities outside of his normal therapy sessions.

Jones also indicated that O.J.P. was going to be evaluated to receive ABA therapy. O.J.P.'s foster family supported O.J.P. receiving services that would help his educational process and his social skills. The foster family was willing to work with "other people," such as "Disability Rights Texas [and] local authority service coordinators[,] to help bring [any] services [that O.J.P. needed] into the home."

According to Jones, O.J.P. required stability, and it was in O.J.P.'s best interest to have a routine and familiarity. O.J.P. also required extensive care from his caregivers. To meet his educational needs, "a lot of time and effort on the part of" O.J.P.'s caregivers outside of school was required. Jones did not believe that mother was capable of meeting those needs. Because of O.J.P.'s age and physical and mental vulnerabilities, it was very important for O.J.P. to have a safe environment in which to live.

O.J.P.'s foster mother testified that O.J.P. had special needs. The first time that O.J.P. came into his foster family's care, in 2016,[28] he could not talk and had a severe speech delay. His behavior was also "off." His foster mother tried to have O.J.P. evaluated for autism by a behavioral health pediatrician at that time, but he was put on a waitlist and then returned to mother's care before his foster mother could have him evaluated. When O.J.P. came into his foster family's care for a second time, in 2017,[29] O.J.P.'s foster mother had him evaluated by a behavioral health pediatrician. At that time, O.J.P. was still exhibiting the same abnormal behaviors, but they were worse. O.J.P. still could not talk and had behavioral issues. His foster mother described his tantrums as "worse than tantrums," stating that they

---

[28]    O.J.P. was one year old when he entered the care of his foster family in 2016. He turned two years old while in his foster family's care.

[29]    O.J.P. was two years old when he entered his foster family's care in 2017. He turned three years old while in his foster family's care.

involved "a lot of screaming" and fighting.  At the time, O.J.P., who was about three years old, could not feed himself or hold a spoon, fork, or cup.  After O.J.P. was evaluated, he was referred to a neurologist and his foster mother had him participate in the recommended occupational, speech, and physical therapies.  But O.J.P. was returned to mother's care before O.J.P. was able to participate in his therapies extensively with his foster family.  O.J.P.'s foster mother estimated that O.J.P. was able to participate in his recommended therapies for about three months before he was removed from the foster family's care and returned to mother's care.

O.J.P.'s foster mother noted that when O.J.P. came back into his foster family's care in 2019,[30] his behavior was worse and more extreme.  He was still not talking and could not be understood.  He screamed to communicate, fell on the floor screaming, threw things, hit, bit, spit, and kicked.  He was afraid to bathe and would shovel food in his mouth using his hands to the point that he was choking and gagging.  Because O.J.P. was unable to be left unsupervised, his foster parents were a part of every service he was provided so that they could assist.  The only time that someone was not watching O.J.P. was when he was sleeping.

During the pendency of this case, while O.J.P. was in his foster family's care, his foster mother had him evaluated, he was diagnosed with autism, and he began receiving speech therapy.  Although O.J.P. also participated in occupational and

---

[30]     O.J.P. was about five years old when he entered his foster family's care in 2019.

physical therapies for a time, those therapies were able to be stopped because his foster family was able to "teach him and get him over that hump." O.J.P.'s foster family taught him how to hold a pencil, fork, and cup. They taught O.J.P. to eat with utensils instead of his hands. O.J.P.'s foster mother noted that with speech therapy, O.J.P.'s speech had improved a lot and his foster family could understand him "a lot better now."

O.J.P.'s foster mother testified that it was a lot of responsibility to take care of O.J.P.'s medical, physical, and emotional needs. Mother acknowledged in her briefing that O.J.P.'s current placement with his foster family was "meeting all of the child's needs."

To help O.J.P., his foster family had implemented a structured routine. Mondays through Fridays, O.J.P. went to school. O.J.P. was now able to wake himself up every morning between 7:00 a.m. and 7:15 a.m. He ate at the same time every day. On Mondays and Wednesdays, O.J.P. attended speech therapy sessions with his school in the afternoons. On Tuesdays and Thursdays, O.J.P. attended private speech therapy sessions in the mornings. O.J.P. ate dinner at 5:00 p.m., and around 6:30 p.m., he picked out his pajamas and showered in his foster parents' bathroom so that he could be supervised. O.J.P. then had downtime. At 7:15 p.m., he read a story, sang a song, said his prayers, and he went to bed at 7:30 p.m. He usually fell asleep at about 8:00 p.m. Because, at the time of trial, O.J.P. was

attending school virtually,[31] O.J.P.'s foster mother explained that she was his daily instructor and she helped him with his synchronous and asynchronous school assignments.[32]

As to O.J.P.'s autism, O.J.P.'s foster mother stated that O.J.P. had trouble understanding and responding to social cues, and he had trouble with eye contact and making friends. He also exhibited behaviors associated with autism such as "[f]lapping" or "[w]alking on his toes." O.J.P.'s foster mother believed that O.J.P. could benefit from ABA therapy and that O.J.P "should have his own unique type of therapy and therapeutic plan." If ABA therapy was available to O.J.P., his foster mother was willing to help facilitate conversations between school personnel and professional therapists so that O.J.P. could be provided services. O.J.P.'s foster mother thought that a program designed specifically for O.J.P. that integrated school

---

[31]     O.J.P.'s foster mother noted that before the COVID-19 pandemic, O.J.P. attended school in person and was at school from 8:00 a.m. to 3:05 p.m. Monday through Friday.

[32]     As to O.J.P.'s virtual schooling schedule, his foster mother explained that O.J.P. had to log onto his computer at 8:00 a.m. to have a Zoom meeting with his teacher. After about forty minutes, he would log off and his foster mother would help O.J.P. do his assignments that needed to be turned in for the day. O.J.P. would log back onto his computer for another forty minutes to engage in instruction with his teacher. He would log off, and O.J.P.'s foster mother would facilitate O.J.P. actually turning in the assignments that he had completed that day. Then, on Mondays and Wednesdays, O.J.P. would have speech therapy through his school virtually from 2:05 p.m. to 2:35 p.m. O.J.P.'s school day ended at 3:05 p.m. O.J.P.'s foster mother stated that when O.J.P. began virtual schooling from home, his foster family completely restructured their schedule to accommodate his virtual schooling.

and home would be a positive thing for O.J.P. and she would welcome that type of therapy for O.J.P.

### 3. Parental Abilities, Plans for Child, Stability of Proposed Placement, and Availability of Assistance

#### a. *Mother*

As discussed above, there is no evidence in the record that mother is able to provide O.J.P. with a safe and stable home, and mother acknowledged in her briefing that she "still s[ought] stability," "had not demonstrated stability in housing," and "struggled throughout the case with homelessness." *See* TEX. FAM. CODE ANN. § 263.307(a); *In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (stability of proposed placement important consideration in determining whether termination of parental rights in children's best interest). Mother had engaged in violence and narcotics use while O.J.P. was in her care and during the time that he was removed from her care. O.J.P. had witnessed domestic violence between mother and father and was present during their physical fights. And mother continued to engage in narcotics use, violent and aggressive behaviors, and criminal conduct during the pendency of this case. *See Schaban-Maurer*, 238 S.W.3d at 824 ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases."). A few months before trial, in August 2020, at Santa Maria Hostel, mother reported that she was "married to a meth user and her fianc[é] [was] a drug dealer." "Both of the

70

men in her life [were] abusive toward her." *See In re L.W.*, 2019 WL 1523124, at *13, *20 ("A parent endangers her children by accepting the endangering conduct of other people."); *Jordan*, 325 S.W.3d at 721 ("[A] child is endangered when the environment creates a potential for danger which the parent is aware of but disregards.").

Mother has been unable to care for O.J.P.'s needs in the past. *See In re E.D.*, 419 S.W.3d at 620 (trial court may measure parent's future conduct by past conduct). Mother has a history of not being able to provide O.J.P. with appropriate dental or medical care, and mother caused O.J.P.'s Medicaid coverage to "lapse." Father noted that when O.J.P. was four-and-a-half years old, his speech was "babbly," he could say "some key words, . . . like mom and dad and car," but "just a few . . . clear words." Father did state that he and mother "ha[d] doctors' appointments whe[re] [they] would get [O.J.P.] evaluated for autism," and they "were getting information about programs that [they] could put him into to get speech therapy," but O.J.P. only received speech therapy for about two months during the entire time that he was in mother and father's care. Father stated that O.J.P.'s Medicaid coverage needed to be reinstated so that he and mother could take O.J.P. to therapy sessions and to doctors' appointments.

Father also explained that while O.J.P. was in the care of mother and father, he had behavioral issues. He would get frustrated because he had a difficult time

71

communicating and he would have temper tantrums. Mother and father would try to calm O.J.P. down, and sometimes they would use candy to do so. According to father, O.J.P. needed a routine to help with his autism, and mother and father never established a routine for O.J.P.

O.J.P.'s foster mother noted that when O.J.P. came back into his foster family's care in 2019, his behavior was worse and more extreme than it had been in the past. He was still not talking and could not be understood. He screamed to communicate, fell on the floor screaming, threw things, hit, bit, spit, and kicked. He was afraid to bathe and would shovel food in his mouth using his hands to the point that he was choking and gagging. Because O.J.P. was unable to be left unsupervised, his foster parents were a part of every service he was provided so that they could assist. The only time that someone was not watching O.J.P. was when he was sleeping.

Mother did not complete the requirements of her FSP in this case.[33] She failed to participate in random narcotics-use testing, substance abuse counseling, her

---

[33] Mother acknowledged in her briefing that she "did not take full advantage" of her FSP and "failed to complete" her FSP. Yet, in a single sentence in her briefing, mother states that "because DFPS couldn't provide any evidence that [m]other understood her FSP[,] . . . it would be a violation of her due process rights to terminate based on this factor." Texas Rules of Appellate Procedure require that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." *See* TEX. R. APP. P. 38.1(i). Conclusory sentences are not enough and the failure to provide substantive analysis waives an issue on appeal. *See In re C.A.J.*, No. 01-19-00704-CV, 2021 WL 243900, at *25–26 (Tex. App.—Houston [1st Dist.] Jan. 26, 2021, pet. denied)

psychosocial evaluation, and domestic violence classes.  Mother did not provide pay stubs for any jobs she may have obtained during the pendency of the case, a leasing agreement, or a completion certificate for the parenting classes that mother told DFPS caseworker Jones she had attended.  Mother never obtained appropriate housing for herself or O.J.P.  A few months before trial, in August 2020, she reported to Santa Maria Hostel that she was "sleeping on the streets" and "eating from trash can[s]."

Jones testified that mother did not have any interest in caring for O.J.P., and mother had not demonstrated an ability to meet O.J.P.'s needs.  Mother was unable to provide O.J.P. with a safe environment.  According to Jones, mother's "presence in th[e] case" was "sporadic."  And she did not visit O.J.P. during the entirety of the case.

b.     *Current Placement*

O.J.P. has been in the care of his foster family three times in the six-and-a-half years of his life.  His foster mother stated that the foster family wanted to adopt

---

(mem. op.).  To the extent that mother attempts to challenge, on due process grounds, the termination of her parental rights based on her failure to comply with her FSP, we hold that mother has waived her complaint due to inadequate briefing. *See* TEX. R. APP. P. 38.1(i); *In re C.A.J.*, 2021 WL 243900, at \*25–26 (single sentence in brief with no analysis is not sufficient to assert complaint on appeal); *see also* TEX. FAM. CODE ANN. § 161.001(b)(1)(O) (trial court may find, as grounds for termination of parent-child relationship, parent failed to comply with provisions of court order that specifically established actions necessary for parent to obtain return of child).

73

O.J.P. and they loved him. He was a part of their family, and his foster parents viewed him as their son. According to O.J.P.'s foster mother, O.J.P.'s foster family was able to provide him with a safe and stable home.[34] O.J.P.'s foster mother planned to continue to take care of O.J.P. and believed that it was in O.J.P.'s best interest to remain in the care of his foster family. Mother acknowledged in her briefing that O.J.P.'s foster family had "demonstrated their ability to provide for [his] current needs."

As detailed above, O.J.P.'s foster family has implemented a structured routine to help O.J.P. navigate his special needs. O.J.P.'s foster mother served as his daily instructor during the COVID-19 pandemic when O.J.P. attended school virtually. O.J.P.'s foster mother stated that when O.J.P. began virtual schooling from home, his foster family completely restructured their schedule to accommodate his virtual schooling.

While O.J.P. had been in his foster family's care during this case, his foster mother had him evaluated, he was diagnosed with autism, and he began receiving speech therapy.[35] Although O.J.P. also participated in occupational and physical

---

[34] O.J.P.'s foster mother noted that her family had been living in their current home since 2018.

[35] When O.J.P. was previously in the foster family's care, O.J.P.'s foster mother had him evaluated in 2017 by a behavioral health pediatrician. At that time, O.J.P. was exhibiting worsening abnormal behaviors. O.J.P. could not talk and had behavioral issues. His foster mother described his tantrums as "worse than tantrums," stating that they involved "a lot of screaming" and fighting. At the time O.J.P., who was

therapies for a time, those therapies were able to be stopped because his foster family was able to "teach him and get him over that hump." O.J.P.'s foster family taught him how to hold a pencil, fork, and cup. They taught O.J.P. to eat with utensils instead of his hands. O.J.P.'s foster mother noted that with speech therapy, O.J.P.'s speech had improved a lot and his foster family could understand him "a lot better now."

O.J.P.'s foster mother also explained that she had participated in several "ARD meeting[s]" with O.J.P.'s school to discuss O.J.P.'s autism. O.J.P.'s foster mother stated that the school personnel had been cooperative in trying to assist and help O.J.P. When O.J.P. was attending school in person before the COVID-19 pandemic, she was in daily contact with school personnel about O.J.P. O.J.P. was in a "life skill[s] class" at school. O.J.P.'s foster mother believed that she could cooperate and assist with O.J.P. being evaluated or tested for "different things" in the future.

O.J.P.'s foster mother testified that O.J.P. could benefit from ABA therapy and that O.J.P "should have his own unique type of therapy and therapeutic plan."

---

about three years old, could not feed himself or hold a spoon, fork, or cup. After O.J.P. was evaluated, he was referred to a neurologist and his foster mother had him participate in the recommended occupational, speech, and physical therapies. O.J.P. was returned to mother's care before O.J.P. was able to participate in his therapies extensively with his foster family. O.J.P.'s foster mother estimated that O.J.P. was able to participate in his recommended therapies for about three months before he was removed from the foster family's care and returned to mother's care.

If ABA therapy was available to O.J.P., his foster mother was willing to help facilitate conversations between school personnel and professional therapists so that O.J.P. could be provided services. O.J.P.'s foster mother thought that a program designed specifically for O.J.P. that integrated school and home would be a positive thing for O.J.P. and she would welcome that type of therapy for O.J.P.

O.J.P.'s foster mother also explained that when O.J.P. had behavioral issues, his foster parents tried to redirect him. She used a "time-in" method, rather than a "time-out," to allow O.J.P. to sit quietly and calm himself down. He "count[ed] and breathe[d], inhale[d], exhale[d] to calm down." O.J.P.'s foster mother wanted to teach O.J.P. to "self-soothe." At home, the "time-in" method worked well because O.J.P. trusted his foster family. The stability in the foster family's home also put O.J.P. in a stable place.

We note that O.J.P. was removed from his foster family's home at one time during the pendency of this case at the request of his foster family. O.J.P.'s foster mother testified that the foster family requested that O.J.P. be removed from their care because O.J.P. was displaying behavioral issues after his visits with father and certain specific behavioral incidents happened. According to O.J.P.'s foster mother, at the time, O.J.P. was having "virtual visits" with father because of the COVID-19 pandemic, and after his visits, his behavior would regress and he would exhibit behaviors like when "he first came back . . . into" the foster family's care. Although

76

the foster family asked for O.J.P. to be removed from the home, O.J.P.'s foster mother was still worried about the adverse effect that removing O.J.P. from the home could have on the child. O.J.P.'s foster mother noted that when O.J.P. was removed from the foster family's home, it was only for seven days, and the foster family agreed to have him return. O.J.P.'s foster mother spoke to the DFPS caseworker about the difficulties O.J.P. was having being in another placement, and the foster family felt that it was "the right thing" to bring him back into their home because they wanted what was best for O.J.P. O.J.P.'s foster mother also testified at length about the difficulties she faced during the COVID-19 pandemic of facilitating O.J.P.'s multiple weekly "virtual visits" with father.

Mother, in her briefing, pointed out that O.J.P.'s foster family requested that he be removed from their home during the pendency of the case and there was no "guarantee[d] permanency" in O.J.P.'s placement with his foster family. Yet a "lack of evidence about [specific] definitive plans" for a child is not dispositive of the best-interest analysis. *See In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013) (internal quotations omitted); *see also In re C.H.*, 89 S.W.3d at 28; *In re L.W.*, 2019 WL 1523124, at *23. Instead, we examine the entire record to determine best interest, even where DFPS is "unable to identify with precision the child's future home environment." *In re E.C.R.*, 402 S.W.3d at 250 (internal quotations omitted). Further, we note that the trial court is in the best position to observe the witnesses

77

and their demeanor and weigh the parties' virtues and therefore is given great latitude in determining the best interest of a child. *See In re S.N.Z.*, 421 S.W.3d 899, 909 (Tex. App.—Dallas 2014, pet. denied); *Pena v. Stoddard*, No. 01-09-00308-CV, 2011 WL 704324, at *5 (Tex. App.—Houston [1st Dist.] Feb. 10, 2011, no pet.) (mem. op.) (trial court "is . . . in a better position to analyze the facts, weigh the virtues of the parties, and determine what will be in the best interest of [the] child"); *see also Cuellar*, 238 S.W.2d at 992 (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

Mother conceded, in her briefing, that any plans that she had for O.J.P. were "still conditioned on her [own] ability to overcome [her] instability." And O.J.P.'s foster mother expressed a desire to adopt O.J.P. if the parental rights of mother and father were terminated. DFPS caseworker Jones stated that O.J.P.'s foster family did understand that "there[] [was] still a lot of legal stuff that ha[d] . . . to happen before they c[ould] . . . adopt" O.J.P. Mother acknowledged in her briefing that O.J.P.'s current placement with his foster family was "safe, stable[,] and protective and [was] meeting all of the child's needs."

Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of mother's parental rights was in the best interest of O.J.P. *See* TEX. FAM. CODE ANN.

78

§ 161.001(b)(2).  We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's parental rights was in O.J.P.'s best interest or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of O.J.P.

Accordingly, we hold that the evidence is factually sufficient to support the trial court's finding that termination of mother's parental rights was in the best interest of O.J.P.  *Id.*

We overrule mother's first issue.

## Managing Conservatorship

In her second issue, mother argues that the trial court erred in appointing DFPS as O.J.P.'s sole managing conservator because "a parent shall be appointed sole managing conservator of [a] child, unless the court determines that such appointment would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development." (Internal quotations omitted.)  And DFPS did not provide sufficient evidence to support its appointment as O.J.P.'s sole managing conservator.

The Texas Family Code provides that "[i]f the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, [DFPS], or a licensed child-placing

79

agency as managing conservator of the child." TEX. FAM. CODE ANN. § 161.207(a); *see also In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at *8 (Tex. App.—Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.) ("When the parents' parental rights have been terminated, [Texas] Family Code section 161.207 governs the appointment of a managing conservator."). Generally, we review a trial court's conservatorship determination for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

Importantly, an order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to her child. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re A.L.J.*, No. 01-19-00251-CV, 2019 WL 4615826, at *9 (Tex. App.—Houston [1st Dist.] Sept. 24, 2019, no pet.) (mem. op.). A parent with no legal rights with respect to her child lacks standing to attack the portion of the trial court's order appointing DFPS as the sole managing conservator of the child. *See In re A.L.J.*, 2019 WL 4615826, at *9.

Here, we overruled mother's complaint that the trial court erred in terminating her parental rights to O.J.P. because the evidence is factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of O.J.P.[36] *See id.* ("Once we overrule a parent's challenge to the termination order,

---

[36] As noted previously, mother did not otherwise appeal the trial court's termination findings, including its findings, as grounds for termination of the parent-child relationship, that mother knowingly placed, or knowingly allowed O.J.P. to remain,

the trial court's appointment of [DFPS] as sole managing conservator may be considered a 'consequence of the termination' . . . ."); *In re S.R.*, 452 S.W.3d 351, 359 n.3 (Tex. App.—Houston [14th Dist.] Nov. 13, 2014, pet. denied) ("A trial court does not abuse its discretion in appointing [DFPS] as conservator of the children where the evidence is sufficient to support termination of parental rights."); *Quiroz v. Dep't of Family & Protective Servs.*, No. 01-08-00548-CV, 2009 WL 961935, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.) (refusing to address parent's complaint evidence insufficient to support DFPS's appointment as sole managing conservator where evidence sufficient to support termination of parent's rights). Thus, the trial court's order terminating mother's parental rights divested her of her legal rights and duties to O.J.P. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re A.L.J.*, 2019 WL 4615826, at *9 ("Because we have overruled [parent's] challenge to the portion of the trial court's order terminating her parental

---

in conditions or surroundings which endangered his physical or emotional well-being; engaged in conduct, or knowingly placed O.J.P. with persons who engaged in conduct, which endangered his physical or emotional well-being; constructively abandoned O.J.P., who had been in the managing conservatorship of DFPS for not less than six months, DFPS made reasonable efforts to return O.J.P. to mother, mother did not regularly visit or maintain significant contact with O.J.P., and mother demonstrated an inability to provide O.J.P. with a safe environment; and failed to comply with the provisions of a court order that specifically established the actions necessary for mother to obtain the return of O.J.P. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O). Thus, mother is bound by those findings. *See In re Y.V.*, No. 02-12-00514-CV, 2013 WL 2631431, at *1–2 (Tex. App.—Fort Worth June 13, 2013, no pet.) (mem. op.); *In re R.A., Jr.*, No. 07-08-0084-CV, 2009 WL 77853, at *2 (Tex. App.—Amarillo Jan. 13, 2009, no pet.) (mem. op.).

rights, the order has divested [her] of her legal rights and duties related to [the children].”); *In re L.M.N.*, 2018 WL 5831672, at *26; *E.A. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016, pet. denied) (mem. op.).

Having no legal rights with respect to O.J.P., we hold that mother lacks standing to challenge the portion of the trial court's order appointing DFPS as sole managing conservator of O.J.P. *See In re C.A.J.*, No. 01-19-00704-CV, 2021 WL 243900, at *21 (Tex. App.—Houston [1st Dist.] Jan. 26, 2021, pet. denied); *In re A.L.J.*, 2019 WL 4615826, at *9 (“[Parent] d[id] not have standing to challenge the portion of the order appointing [DFPS] as permanent managing conservator of the children because any alleged error could not injuriously affect her rights.”); *In re Y.V.*, No. 02-12-00514-CV, 2013 WL 2631431, at *1–2 (Tex. App.—Fort Worth June 13, 2013, no pet.) (mem. op.).

We overrule mother's second issue.

## Conclusion

We affirm the order of the trial court.

Julie Countiss
Justice

Panel consists of Justices Goodman, Landau, and Countiss.

82